UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE SHAPIRO,<br>　　　　Plaintiff,<br>　　v.<br>ERIC LUNDAHL, et al.,<br>　　　　Defendants. | Case No. 16-cv-06444-MEJ<br>**ORDER RE: MOTION TO DISMISS SAC**<br>Re: Dkt. No. 34 |

## INTRODUCTION

Defendant Eric Lundahl moves to dismiss the Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Plaintiff Lawrence Shapiro filed an Opposition (Dkt. No. 35) and Defendant filed a Reply (Dkt. No. 36). The Court finds this Motion is suitable for disposition without oral argument and vacates the July 13, 2017 hearing. *See* Civ. L.R. 7-1(b); Fed. R. Civ. P. 78. Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS** Defendant's Motion for the following reasons.

## BACKGROUND

**A.　Dismissed Pleadings**

This action arises out of an airplane crash that occurred on November 5, 2014 in San Felipe, Mexico. Shapiro was traveling in a private plane piloted and owned by Lundahl; he alleges that Lundahl's actions and omissions caused the crash, resulting in catastrophic injuries to Plaintiff. The Court has twice held Shapiro failed to allege facts sufficient to show the existence of federal jurisdiction over his claims and dismissed the Original and First Amended Complaints on that basis.

1. Original Complaint

On November 4, 2016, Shapiro filed the original Complaint in this Court. He alleged three claims for violations of Federal Aviation Administration ("FAA") regulations. *See* Compl., Dkt. No. 1. He named as defendants Lundahl, as well as a number of entities related to Baja Pirates.[1] Lundahl moved to dismiss the Complaint on the ground it failed to state a claim upon which relief can be granted. *See* First MTD, Dkt. No. 6. The Court dismissed the Complaint, holding that the "FAA creates an extensive administrative scheme[,] but the Ninth Circuit has concluded, repeatedly and without equivocation, that it does not create a private right of action." First Order at 3 (internal quotation marks and citations omitted), Dkt. No. 25. The Court allowed Plaintiff to file an amended complaint. *Id.* at 4.

2. First Amended Complaint

Shapiro timely filed his First Amended Complaint ("FAC"), which Lundahl once more moved to dismiss. *See* FAC, Dkt. No. 26; Second MTD, Dkt. No. 27. Shapiro for the most part reasserted the allegations he had included in the Original Complaint, adding a few more details regarding the basis for his claims. *See* FAC. In relevant part, the FAC alleged Lundahl was negligent in deciding to plan the trip without any intermediate stops for refueling despite the availability of refueling stops (*id.* ¶ 16); not becoming familiar with all available information concerning the flight, including fuel requirements (*id.* ¶ 26); not having enough fuel in the plane when beginning the flight (*id.* ¶ 28); refusing to land to refuel at Loreto International Airport (*id.* ¶ 20); and failing to land the plane at San Felipe International Airport (*id.* ¶ 22-24). Based on these allegations, Plaintiff asserted claims based on violations of FAA regulations (claims 1-3) and general negligence (claim 4). He asserted federal jurisdiction existed based on admiralty. *Id.* ¶ 5.

The Court again dismissed the claims based on FAA regulations. *See* Second Order at 4, Dkt. No. 31. The Court also found Plaintiff failed to allege facts sufficient to show admiralty

---

[1] Baja Pirates of California, a corporation; Baja Pirates of Mexico, a Mexican corporation; Baja Pirates of California, an organization of unknown form; and Baja Pirates of Mexico, an organization of unknown form. For purposes of this Order, the Court finds any distinction between these entities is not material, and refers to them collectively as "Baja Pirates."

2

jurisdiction existed:

> [T]he FAC alleges no facts sufficient to show the negligent acts that allegedly caused the crash occurred over navigable water. On the contrary, Plaintiff alleges Defendant was negligent in planning the trip in La Paz (on dry land), in refusing [to] land the plane to refuel at Loreto (on dry land), and in crashing the plane in San Felipe (on dry land). . . . The only allegation suggesting this action has any connection to water is that the plane flew over the Sea of Cortez at some point before the accident. This is insufficient to confer admiralty jurisdiction.

*Id*. at 5. The Court also noted the FAC did not appear to allege facts sufficient to show the accident bore "a significant relationship to traditional maritime activity" as it only alleged Lundahl was transporting friends or business associates up the Coast of Baja. *Id*. at 6-7. It granted Shapiro a final opportunity to amend. *Id.* at 7.

**B.    Factual Allegations of the SAC**

Baja Pirates is a sports-fishing business owned by Lundahl, and is based in La Paz, Mexico. SAC ¶¶ 12-15, 18, Dkt. No. 32. Lundahl and Shapiro traveled to La Paz to promote Baja Pirates. *Id*. ¶¶ 15, 19. On November 5, 2014, Shapiro and Lundahl left La Paz in a Cessna model 182K aircraft, with the ultimate destination of Palo Alto, California. *Id.* ¶¶ 1-2, 19-20. Baja Pirates owned the Cessna; the only people on the plane were Lundahl, Shapiro, and Shapiro's wife and daughter. *Id*. ¶¶ 8, 13, 15, 20.

Although Shapiro "has been a pilot licensed to act as a Pilot in Command ('PIC') with passengers for most of his life[,]" he alleges that on November 5, 2014, he was a passenger, and that Lundahl acted as PIC of the plane. *Id*. ¶¶ 2, 11. Shapiro alleges Lundahl calculated he had enough fuel to fly for 4.9 hours, which, assuming no wind and no deviation from the straight line trajectory, the plane could have reached the planned destination of Calexico with less than 30 minutes of flight time remaining. *Id*. ¶¶ 3-4; *see also id*. ¶ 21 (Lundahl decided to fly direct from La Paz to Calexico, California, after consulting flight software program). While flying over the Sea of Cortez, due to headwinds that reduced the plane's ground speed, Lundahl should have known it was impossible to reach Calexico with the amount of fuel remaining on board. *Id*. ¶¶ 5, 26. Shapiro asked Lundahl to land at Loreto airport to refuel and allow the passengers a break; Lundahl vehemently refused to land. *Id*. ¶ 25. After flying over San Felipe, Mexico, Lundahl

decided to turn around and stop at San Felipe International Airport in Mexico to refuel the plane. *Id*. ¶¶ 6-7, 27. "On the descent to the airport, the plane encountered turbulence and with only seconds remaining before landing," Lundahl told Shapiro to take control of the plane. *Id*. ¶ 8. "With less than a minute before touchdown, and while on approach to the runway, Plaintiff took the controls of the plane and did his best to" land the plane safely on the ground; the plane stopped at the edge of the runway, but all four occupants of the plane were injured. *Id*. ¶ 8.

Plaintiff asserts three negligence claims, and argues federal question jurisdiction exists because his claims are governed by admiralty.

## LEGAL STANDARD

Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted).

A court may dismiss a complaint under Rule 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Id.* at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007). In addition, courts may consider documents attached to the complaint. *Parks Sch. of Bus., Inc. v.*

*Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted).

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotations and citations omitted). However, the Court may deny leave to amend for a number of reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**DISCUSSION**

**A.　Admiralty Jurisdiction**

> A tort claim falls within the admiralty jurisdiction of the federal courts when two conditions are met. First, the tort must occur on or over navigable waters; this is the "locality" or "situs" test. *See Solano v. Beilby*, 761 F.2d 1369, 1370–71 (9th Cir. 1985); *Guidry v. Durkin*, 834 F.2d 1465, 1469 (9th Cir. 1987). Second, the actions giving rise to the tort claim must "bear a significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 268 (1972). This is the "nexus" or "relationship" test. *See Solano*, 761 F.2d at 1371; *Guidry*, 834 F.2d at 1469. Admiralty jurisdiction exists only when both these requirements are satisfied. *See Whitcombe v. Stevedoring Services of America*, 2 F.3d 312, 314 n. 2 (9th Cir. 1993).

*Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir. 2005).

**B.　Analysis**

The Court finds the SAC does not allege facts sufficient to meet either the "situs" or the "nexus" tests.

　　1.　"Situs" Test

In the Ninth Circuit, the "situs" of the tort is "where the injury occurs" – not where the negligence took place. *Id*. at 1085 ("It is clear, then, that the place of the injury is the determinative factor."); *see also Solano v. Beilby*, 761 F.2d 1369, 1371 (9th Cir. 1985) ("In examining the first part of the maritime tort test, courts have traditionally defined the locus of the

5

tort as the place where the injury occurs." (citing cases)). Plaintiff does not allege that the injury took place on navigable water, and does not dispute the plane crashed on land; he argues instead that admiralty jurisdiction exists because at least one of the negligent acts he alleges contributed to the crash took place while the plane was flying over navigable water. Opp'n at 4-5. In dismissing the FAC, the Court rejected this argument and found that "[t]he only allegation suggesting this action has any connection to water is that the plane flew over the Sea of Cortez at some point before the accident" and that this was "insufficient to confer admiralty jurisdiction." Second Order at 5 (citing *Executive Jet*, 409 U.S. at 268; *In re Air Crash Off Point Mugu, Cal.*, 145 F. Supp. 2d 1156, 1164 (N.D. Cal. 2001) ("Admiralty jurisdiction does not arise in aviation crash cases simply because the crash or the wrongful conduct occurred on or over navigable waters.")). To avoid dismissal, Plaintiff argues admiralty jurisdiction exists because Lundahl's initial decision not to divert to San Felipe to refuel after observing "white caps" on the Sea of Cortez made the crash inevitable. Opp'n at 4.

To assert maritime jurisdiction applies, Plaintiff once again relies on *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 813-18 (7th Cir. 2015) and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534-36 (1995). *See* Opp'n at 5-6. *Lu Junhong* concerned a plane crashing into the seawall separating a runway at San Francisco International Airport from the San Francisco Bay. 792 F.3d at 807-08. When some of the passengers filed suit in state court in Illinois, defendant Boeing removed the case by asserting federal jurisdiction existed on a number of grounds, including admiralty. *Id.* The district court remanded for lack of subject matter jurisdiction, concluding in relevant part there was no admiralty jurisdiction because "the tort occurred on land, when the plane hit the seawall, rather than over navigable water." *Id.* at 808. The Seventh Circuit reversed, holding admiralty jurisdiction existed where a commercial plane crashed into the seawall after it had just completed a transoceanic flight and the cause of the crash was alleged to have occurred over navigable waters. *Id.* at 814 (the National Transportation Safety Board "concluded that by 10 seconds before impact a collision was certain . . . This means that, while the plane was over San Francisco Bay (part of the Pacific Ocean), an accident became inevitable. And the plaintiff's own theory of liability pins a portion of the blame on Boeing

6

because, about 4.5 nautical miles from the seawall, the auto-throttle system disengaged . . . and caused the plane to descend faster than the pilots appreciated."); *see also In re Air Crash at Belle Harbor, N.Y.*, 2006 WL 1288298, at *12 (S.D.N.Y. May 9, 2006) (locality test met even though crash and injuries occurred on land because it was "undisputed that the loss of the vertical stabilizer and rudder over Jamaica Bay left the Aircraft incapable of flight. From that moment forward, the deaths of all those aboard the Aircraft were inevitable."). Similarly, in *Jerome B. Grubart*, the Supreme Court extended admiralty jurisdiction to cases involving injuries that were suffered on land but caused by a vessel on navigable water. 513 U.S. at 532-36 (relying on Extension of Admiralty Jurisdiction Act to find jurisdiction existed in action involving flooding of a freight tunnel under a navigable river that was caused by a barge: "The purpose of the Act was to end concern over the sometimes confusing line between land and water, by investing admiralty with jurisdiction over 'all cases' where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land.").

The allegation that the crash became "inevitable" over the Sea of Cortez when Lundahl saw white caps is purely conclusory; Plaintiff does not allege any plausible facts to support this contention. For example, Plaintiff alleges no facts showing that, based on his investigation or that of the authorities, the accident became inevitable when Lundahl saw white caps over the Sea of Cortez but decided to keep flying. Unlike the accidents in *Lu Junhong* or *Belle Harbor*, Plaintiff does not allege a discrete event caused the crash. On the contrary, Plaintiff identifies numerous factors that caused the need to make an unplanned stop at San Felipe in the first instance: Lundahl's failure to understand the variables that might affect his flight time and calculate the amount of fuel needed for the trip; Lundahl's failure to plan a refueling stop on the way to Calexico; his refusal to land at Loreto airport to refuel when Plaintiff asked him to do so; his failure to appreciate headwinds and decreased ground speed meant he would not have sufficient fuel to reach Calexico; his initial refusal to land at San Felipe; his inability to land the plane in strong headwinds; and Shapiro's inability to rescue the landing Lundahl had set up. Plaintiff alleges only one of these myriad acts took place over navigable water. Moreover, the SAC does not allege the plane crashed because it ran out of fuel—it alleges the plane crashed because of

Lundahl's inability to land the plane after turning back to refuel in San Felipe, and Shapiro's inability to correct Lundahl's errors when he took over minutes from landing. *See id.* ¶ 28. Lundahl surrendered control of the plane to Shapiro "close to the runway" "on short final" and Shapiro was unable to safely complete the landing process Lundahl had set up. *Id*. ("Defendant yelled . . .'I can't handle it – you take it!'"). As such, the SAC does not allege facts sufficient to show the crash became inevitable because of negligence that occurred over navigable water. And finally, unlike the flooding in *Jerome B. Grubart*, the accident was not caused on land by the acts of a vessel in water. The SAC alleges Lundahl turned over control of the plane to Shapiro close to the runway, that Shapiro could not correct the landing process Lundahl had set up, and that the plane crashed on land. Navigable waters were not involved in this accident.

As it found in dismissing the FAC, the Court once again finds Plaintiff fails to allege facts sufficient to show under the Ninth Circuit's "situs" test that the injury occurred on or over navigable waters. *See* Second Order at 6.

2. "Nexus" Test

In order to evaluate whether the accident has a significant relationship to traditional maritime activity, courts first "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce" and then whether "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1126 (9th Cir. 2009) (internal quotation marks and citations omitted). Importantly, while "the wrong must have a significant relationship with traditional maritime activity, [ ] the maritime activity need not be a commercial one. It suffice[s] that the wrong . . . involve[s] the negligent operation of a vessel on navigable waters." *Id*. at 1128 (citations omitted).

   *a.   Potentially disruptive impact*

Plaintiff argues the "general features" of the accident are the "failure of the vessel . . . to divert to an intermediate destination when it became apparent that there was not enough fuel on board to carry on to the original intended destination. Any airplane or ocean going ship without sufficient fuel on board to reach its destination could have been left stranded, drifting or crashing

8

at any time." Opp'n at 8. He argues this "clearly" would have an effect on maritime commerce because planes are intended to reach their destination and not run out of fuel and crash or be left drifting. *See id*. at 9. The authorities he cites do not support his contention that this is sufficient to have an effect on maritime commerce.

In *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827 (9th Cir. 2002), the plaintiff's husband disappeared from a cruise ship sailing in the Mediterranean; his body washed ashore near Greece. The widow filed suit alleging a number of causes of action, including a claim for intentional infliction of emotional distress based on the ship master's remarks to her that her husband had fallen overboard, died in the fall, his body would be sucked under the ship and chopped up by propellers and probably would not be recovered; and defendants' failure to provide promised legal counsel or psychological assistance. 306 F.3d at 831, 840. Plaintiff argued maritime law did not apply to her suit because the incident underlying it—i.e., the crewmembers' verbal conduct—was not substantially related to traditional maritime activity. *Id*. at 840. The Ninth Circuit found the plaintiff focused too narrowly on the cause of the alleged harm, and held instead that the relevant activity was a cruise ship's treatment of passengers generally, which "clearly has potential to disrupt commercial activity, and certainly has substantial relationship to traditional maritime activity." *Id*. at 840-41.

In *Sisson v. Ruby*, 497 U.S. 358, 364 (1990), a fire erupted in a docked yacht, destroying the yacht and damaging several neighboring vessels and the marina. The yacht owner filed suit in district court, arguing maritime law limited his liability for damages to the salvage value of the yacht. The Seventh Circuit affirmed the district court's dismissal of the action for lack of subject-matter jurisdiction. The Supreme Court disagreed:

> Certainly, such a fire has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels. . . . The jurisdictional inquiry does not turn on the actual effects on maritime commerce of the fire . . . nor does it turn on the particular facts of the incident in this case, such as the source of the fire or the specific location of the yacht at the marina, that may have rendered the fire on the [yacht] more or less likely to disrupt commercial activity. Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity. Here, the general features—a fire on a vessel docked at a

9

> marina on navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity.

497 U.S. at 362-63.

Finally, the district court in *In re Mission Bay* dismissed the action for lack of admiralty jurisdiction after concluding "there was no potential impact on maritime commerce because the incident involved injuries from a single-recreational vessel accident in an area where no commercial shipping occurs." 570 F.3d at 1126. The Ninth Circuit examined whether the "general features of [the] incident have a potentially disruptive effect on maritime commerce" and concluded the incident was best described as "harm by a vessel in navigable waters to a passenger." *Id*. at 1128. Although there had been no actual disruption, the Supreme Court reasoned that there potentially could have been a disruptive impact: "Among other things, a vessel from which a passenger goes overboard in navigable waters would likely stop to search and rescue, call for assistance from others—which, in this area, could include the Coast Guard and in fact did involve another vessel—and ensnarl maritime traffic in the lanes affected." *Id*. at 1129.

The Court cannot find the general features of Plaintiff's accident are similar to the aforementioned cases: here, no type of water craft was involved and the accident did not occur in water; the accident was not caused by a vessel on navigable water and did not injure vessels, structures, or persons on navigable waters; because the plane crashed at the airport, it was likely to disrupt land- and air-based commerce, but not maritime commerce. The Court finds the general features of this incident are negligently planning a flight and operating a plane, neither of which impacts maritime commerce. That a portion of the doomed flight took place over water is insufficient, without more, to confer admiralty jurisdiction. *See Executive Jet*, 409 U.S. at 270-71 ("It is clear, therefore, that neither the fact that a plane goes down on navigable waters nor the fact that the negligence 'occurs' while a plane is flying over such waters is enough to create such a relationship to traditional maritime activity as to justify the invocation of admiralty jurisdiction.").

    b.  *Substantial relationship to traditional maritime activity*

Plaintiff argues the incident had a substantial relationship to traditional maritime activity because: (1) the activity of carrying passengers over the High Seas from a port in Mexico to a port in the United States is "clearly related to traditional maritime activity"; and (2) promoting a

10

fishing resort itself is substantially related to traditional maritime activity. *See* Opp'n at 9. Neither argument prevails.

Admiralty jurisdiction may lie if, but for aviation, the journey would have been conducted by sea. *See In re Air Crash*, 145 F. Supp. 2d at 1164-65 ("The maritime air crash cases, *Offshore Logistics*, *Williams*, *Roberts* and *Honolulu*, stand for the proposition that admiralty jurisdiction lies if, but for aviation, the journey would have been conducted by sea. In this respect Puerto Vallarta is more like Hawaii than New York—the destination of the *Executive Jet* aircraft."); *Lu Junhong*, 792 F.3d at 816 (noting most courts have found plane accidents occurring over water bear a significant relationship to traditional maritime activity, but citing as exception *United States Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft Ltd.*, 582 F.3d 1131 (10th Cir. 2009), where the Tenth Circuit "stressed that the flight was not commercial.")). The SAC does not, however, allege (much less allege facts sufficient to show) the journey from La Paz to Calexico and on to Palo Alto traditionally would have been conducted by sea; Plaintiff only offers this argument in his Opposition. *See* Opp'n at 9 (citing *In re Mission Bay*, 570 F.3d at 1126). *In re Mission Bay* does not support this proposition; that case concerned "operating a vessel"—a jet ski—"in navigable waters. . . . [T]his clearly falls within the substantial relationship. . . . Vessels have traditionally carried passengers across navigable waters. Being a vessel, this jet ski has a maritime connection." *Id*. at 1129. The Ninth Circuit rejected criticism that it read applicable authorities too broadly by distinguishing *Executive Jet*: "Unlike *Executive Jet* . . . , for example, where an airplane crashing fortuitously into navigable waters was not maritime-related, here there is a clear connection between a vessel traveling on navigable waters, causing injury to a passenger, and traditional maritime activity." *Id*. at 1129-30. Neither the SAC's allegations nor Plaintiff's Opposition reveal such a clear connection between the vessel (here, a private plane carrying friends or business associates by air), the trip (here, traveling from Baja California to Northern California), and traditional maritime activity.

While fishing is a traditional maritime activity (Opp'n at 9), the SAC does not allege Plaintiff was injured while fishing. The SAC alleges Plaintiff was injured when traveling, in a plane, after having participated in promotional activities for a fishing resort. The cases Plaintiff

11

cites concern incidents occurring in connection with fishing and fishing boats—not in connection with traveling by plane to or from a fishing resort. *See* Opp'n at 9-10. The Court finds this distinction is material.

## CONCLUSION

Plaintiff's conclusory allegation that the crash became inevitable when Defendant realized (or should have realized) as he was flying over the Sea of Cortez that he needed to stop in San Felipe to refuel, but chose to keep flying, is conclusory. It, and the remaining allegations of the SAC, are insufficient to meet either the "situs" or the "nexus" tests, and therefore insufficient to establish admiralty jurisdiction exists. Accordingly, the Court **GRANTS** Defendant's Motion and **DISMISSES** the SAC.

Plaintiff has thrice failed to demonstrate federal jurisdiction exists in this matter. The Court previously stated that this would be Plaintiff's final opportunity to file an amended complaint. Second Order at 7. At this point, the Court finds granting him further leave to amend would be futile, and dismisses the SAC **WITHOUT LEAVE TO AMEND**. The Clerk of the Court is directed to close the case.

**IT IS SO ORDERED.**

Dated: July 7, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge